## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| Sprint Spectrum L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| Brian Moline, Robert Krehbiel and | ) | No. 07-2130-KHV |
| Michael Moffet, in their Official | ) | |
| Capacities as the Commissioners of | ) | |
| the Kansas Corporation Commission. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SPRINT SPECTRUM, L.P.'S COMPLAINT OR IN THE ALTERNATIVE TO REFER TO THE FEDERAL COMMUNCATIONS COMMISSION

COME NOW the defendants Brian Moline, Robert Krehbiel and Michael Moffet in their official capacities as Commissioners of the State Corporation Commission of the State of Kansas, (Commissioners and KCC respectively) and state as follows in support of their Motion to Dismiss.

**Background**

1.      On March 23, 2007, Sprint Spectrum, L.P. (Sprint) filed its Verified Complaint for Declaratory and Injunctive Relief (Complaint), Motion for Temporary Restraining Order And/Or Preliminary Injunction (Motion), and Memorandum of Law in Support of Its Motion for a Temporary Restraining Order And/Or Preliminary Injunction (Memorandum).  A hearing on

Sprint's Motion was held on March 27, 2007. An Order denying the Motion was issued April 6, 2007.[1]

2.      Sprint claims that the Lifeline requirement, promulgated by the KCC in its October 2, 2006 <u>Order Adopting Requirements For Designation of Eligible Telecommunications Carriers</u> (October 2 Order) in Docket No. 06-GIMT-446-GIT (446 docket), is invalid because it is preempted by federal law. The Lifeline requirement provides, in relevant part:

> ETCs are required to allow Lifeline customers to choose a calling plan and to apply the Lifeline discount to the plan selected by the customer. Any ETC that does not allow customer selection at this time must do so within 180 days of the date of this Order.

<u>October 2 Order</u> ¶ 77. Sprint argues that this rule is invalid because it: (1) is inconsistent with the federal Lifeline and Link Up regulations, in violation of 47 U.S.C. § 254(f)[2] (Complaint ¶¶ 38-40); (2) is inconsistent with the federal Lifeline and Link Up regulations at 47 C.F.R. § 54.403(b)[3] (Complaint ¶¶ 41-43); and (3) regulates rates for CMRS carriers and therefore is preempted under 47 U.S.C. § 332(c)(3)(A)[4] (Complaint ¶¶ 44-46).

3.      Sprint asks the Court for an Order:

---

[1] Counsel for Sprint clarified at the hearing that plaintiff only sought a temporary restraining order.

[2] 47 U.S.C. § 254(f)("A state may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. . . . A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.").

[3] 47 C.F.R. § 54.403(b)("Other eligible telecommunications carriers shall apply the Tier-One federal Lifeline support amount, plus any additional support amount, to reduce their lowest tariffed (or otherwise generally available) residential rate for the services enumerated in § 54.101(a)(1) through (a)(9), and charge Lifeline consumers the resulting amount.").

[4] 47 U.S.C. § 332(c)(3)(A)("[N]o state or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.").

a.      Declaring that the Kansas Lifeline Rule is preempted by federal law, specifically 47 U.S.C. § 254(f), 47 U.S.C. § 332(c)(3)(A), and 47 C.F.R. § 54.403(b);

b.      Temporarily restraining the Defendants and any employees or agents of the Kansas Corporation Commission from taking any action to enforce or attempt to enforce any provision of the Kansas Lifeline Rule against Sprint;[5]

c.      Permanently enjoining the Defendants and any employees or agents of the Kansas Corporation Commission from taking any action to enforce or attempt to enforce any provision of the Kansas Lifeline Rule against Sprint; and

d.      Granting Sprint such further relief as the Court may deem just and reasonable.

Complaint at 11-12, ¶¶ 1-4.

**Argument**

4.      a.      The Court should dismiss Sprint's Complaint under Federal Rule of Civil Procedure 12(b)(6) because the KCC Lifeline requirement is not in violation of 47 U.S.C. § 254(f), 47 C.F.R. § 54.403(b) or 47 U.S.C. § 332(c)(3)(A).

b.      In the alternative, the Court should stay its proceedings and refer this issue to the Federal Communications Commission (FCC).

**Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate.**

5.      Dismissal for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), is proper "when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." Lovell v. State Farm Mut. Auto Ins. Co., 466 F.3d 893, 898-99 (10th Cir. 2006) (quoting McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 997

---

[5] Sprint also sought a preliminary injunction, but rescinded that request at the March 27, 2007 hearing.

(10th Cir. 2002)).  The KCC has authority to adopt regulations relating to universal service, including Lifeline in addition to those promulgated by the FCC, as long as those regulations are not inconsistent with the FCC's rules.  47 U.S.C. § 254(f).  The KCC's requirement that eligible telecommunications carriers (ETC)[6] offer the Lifeline discount on all its plans is consistent with the federal universal policies, regulations, practices and goals, even if Sprint's interpretation of 47 U.S.C. § 54.403(b) is correct, because the KCC has explicit authority to adopt standards for ETC designation in addition to those promulgated by the FCC.

**47 C.F.R. § 54.404(b)**

6.      Sprint contends that the requirement adopted by the KCC runs counter to the FCC's policies in two ways.  The FCC's rules, at 47 C.F.R. § 54.403(b), state that ETCs shall apply Lifeline subsidies "to reduce their lowest tariffed (or otherwise generally available) residential rate."  Sprint contends, first, that this reflects the FCC's intent to restrict Lifeline subsidies to a carrier's lowest generally available residential rate plan.  Complaint ¶¶ 20-23, 31, 33(b).  Second, Sprint asserts that it cannot obtain Lifeline subsidies for plans other than its lowest generally available rate plan.  Complaint ¶ 33(c).  Thus, it alleges, the Kansas Lifeline requirement amounts to rate-regulation of commercial mobile radio service (CMRS) providers, which is preempted by section 332(c)(3)(A).[7]

7.      Sprint's interpretation of 47 C.F.R. § 54.403(b) is one possible interpretation of the regulation.  However, it is at least equally possible that the FCC rule simply means that Lifeline support is to be applied to the lowest tariffed or to any other rate plan that is otherwise generally available, as the KCC has interpreted it.  This Court determined "[b]oth interpretations

---

[6] A carrier must be designated an eligible telecommunications carrier to be eligible for receipt of federal universal service, including federal Lifeline support, by the state commission, assuming it has the authority to designate, or by the FCC, if it does not.  Sprint sought and received ETC designation from the KCC.

[7] As noted above, 47 U.S.C. § 332(c)(3)(A) states that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service[.]"

are grammatically plausible, and plaintiff cites no authority that its interpretation is the correct one." April 6, 2007 Order, p. 6. Sprint's construction lacks support. The FCC has endorsed state authority to define the level of service eligible for Lifeline support. In its order adopting 47 C.F.R. § 54.403(b), the FCC stated that the "program currently reduces end-user charges that low-income consumers in participating jurisdictions pay for some *state-specified level of local service* that includes access to the PSTN and some local calling."[8]  In the Matter of Fed.-State Joint Bd. on Universal Serv., CC Docket No. 96-45, Report and Order, 12 FCC Rcd 8776, 8957, ¶ 341 (1997) (Lifeline Order) (emphasis added).

    8.     The FCC initially determined that state commissions had no discretion in designating ETCs in non-rural service areas but had to limit eligibility requirements to those determined by the FCC.  Lifeline Order at 8851, ¶ 135.  The KCC designated Sprint an ETC in non-rural areas.[9]   The FCC's determination on state commission authority when designating ETCs was challenged in Texas Office of Public Utility Counsel v. FCC, 183 F. 3d. 393 (5th Cir. 1999.)  That court stated in construing 47 U.S.C. 214(e): "Nothing in the statute, under this reading of the plain language, speaks at all to whether the FCC may prevent state commissions from imposing additional criteria on eligible carriers."  Id. at 418.  The court reversed "the portion of the Order prohibiting states from imposing any additional requirements when designating carriers as eligible for federal universal service support."  Id.  The 5th Circuit decision and additional rulings by the FCC make the KCC's authority to adopt its Lifeline requirement for carriers it designates as ETCs for federal support clear.

    9.     Moreover, the FCC has specifically permitted carriers to use Lifeline support for plans that are different from the lowest price rate plan.  See In the Matter of Lifeline and Link-

----

[8] This statement by the FCC characterizes the Lifeline plan in effect at that time, but the FCC has not  diminished the states' authority to determine local usage.
[9] Docket No. 99-SSLC-173-ETC.

Up, WC Docket No. 03-109, Report and Order and Further Notice of Proposed Rulemaking, 19

FCC Rcd 8302, 8330, ¶ 53 (rel. Apr. 29, 2004) (Lifeline and Link-Up Order).  In the Lifeline and

Link-Up Order, the FCC expressly rejected a recommendation to prohibit Lifeline subscribers

from purchasing vertical services, such as caller ID, call waiting, and three-way calling as part of

their subsidized rate plan.   Id.   It concurred with the Universal Service Joint Board that

restrictions on low-income subscribers' ability to purchase vertical services would discourage

qualified consumers from participating in the program.  See In the Matter of Fed.-State Joint Bd.

on Universal Serv., Recommended Decision, CC Docket No. 96-45, FCC 03J-2, ¶ 62 (rel. Apr.

2, 2003).   Since the FCC permits Lifeline customers to subscribe to rate plans that include

vertical services, it follows that Lifeline subscribers also may choose among calling plans and

are not limited to their carrier's lowest cost plan.

    10.    The Lifeline and Link-Up Order demonstrates the FCC's intention to allow

Lifeline customers to purchase the telecommunications services that meet their individual needs

in order to promote universal service.   Although vertical services (such as call waiting, call

forwarding, voice mail, and caller ID) increase the rates charged to consumers, the FCC

determined that Lifeline support should be extended to qualifying Lifeline customers who choose

calling plans that included these additional services.   There is no indication that the rule would

be different for wireless rate plans.   A low-income customer's calling needs certainly could

exceed those of a basic rate plan, as the FCC recognizes in rejecting the recommendation to

preclude Lifeline customers from subscribing to plans that include vertical services.   Under

Sprint's interpretation of 54.403(b), however, low-income customers might be discouraged from

participating in the Lifeline program because they would be limited to a plan without sufficient

minutes and vertical services to meet their needs. Sprint's interpretation of 47 C.F.R. §
54.403(b) is inconsistent with the FCC's Lifeline policies as expressed in its orders.

11.     More recently, the FCC has interpreted its rules to permit states to decide what
level of "local usage" a carrier must provide customers to qualify for universal service support,
including Lifeline support. The FCC adopted a list of basic services that carriers must
demonstrate that they provide to be designated ETCs, but has declined to impose any specific
local usage threshold. In the Matter of Fed.-State Joint Bd. on Universal Serv., CC Docket No.
96-45, Report and Order, 20 FCC Rcd 6371 (2005) (ETC Order) at 6385, ¶ 32 (rel. March 17,
2005). Instead, the FCC requires competitive ETCs, like Sprint, to provide a usage plan
*comparable* to the incumbent wireline carrier's plan. See id. The FCC approved a range of
options to meet the comparability requirement, including calling plans with varying minutes of
use, or even unlimited local minutes bundled with long distance minutes. See id. at 6385, ¶ 33.
Wireline carriers' Lifeline offerings include unlimited local minutes of use, so wireless carrier
plans must include a significant number of minutes to meet the comparability requirement.
Finally, at ¶ 34, the FCC states:

> We encourage state commissions to consider whether an ETC offers a local usage
> plan comparable to those offered by the incumbent in examining whether the ETC
> applicant provides adequate local usage to receive designation as an ETC. In
> addition, although the Commission has not set a minimum local usage
> requirement, there is nothing in the Act, Commission's rules, or orders that would
> limit state commissions from prescribing some amount of local usage as a
> condition of ETC status.

12.     The KCC, like the FCC, has not adopted a local usage requirement that the
wireless ETC must meet, but a wireless carrier's lowest cost plan is unlikely to meet the
comparability requirement. Sprint was designated an ETC in Docket No. 99-SSLC-173-ETC,
Order issued January 18, 2000, before the FCC promulgated its requirement that wireless ETCs

must offer usage comparable to that of wireline carriers.  However, local usage was a concern at the time of Sprint's designation,[10] and all carriers designated as ETCs must comply with general requirements placed on ETCs by the FCC and state commissions and have the opportunity to participate in dockets where such requirements are decided, as Sprint did in the 446 docket. Until Sprint sought reconsideration of the Commission's decision in that docket, the Commission was not aware Sprint was not offering its Lifeline customers a choice of plans.  Sprint has not demonstrated to the KCC that its lowest cost plan meets the requirement to offer comparable local usage.  State commissions not only have discretion to require that  Lifeline subscribers  of wireless ETCs have access to calling plans that are comparable to wireline local service offerings, they have an obligation to do so.  Although, the FCC is not limiting its discussion of comparable local usage to Lifeline plans, it does not indicate that the local usage issue is different for Lifeline customers, so the same considerations apply.

**47 U.S.C. § 332(c)(3)(A)**

13.    Finally, the KCC is not imposing unlawful CMRS rate regulation through its Lifeline requirement.  Sprint's claim that it will not be able to obtain federal Lifeline subsidies for rate plans other than its lowest residential rate plan is completely unfounded.  The Universal Service Administrative Company (USAC) pays carriers Lifeline support, regardless of the rate plan Lifeline customers choose.[11]  47 C.F.R. § 54.401(a) defines Lifeline as a "retail local service offering" ... "available only to qualifying low-income consumers" ... "for which qualifying low-income consumers pay reduced charges as a result of application of the Lifeline support amount described in § 54.403;[12] and ... "includes the services or functionalities enumerated in §

---

[10] 173 docket, January 18, 2000 Order ¶¶ 17, 21, 24.
[11] The KCC has submitted a data request to USAC's Vice President of High Cost/Low Income to attempt to confirm that it correctly understands USAC's practice.  USAC has not yet responded.

[12] § 54.403 explains the federal Lifeline support amount.

54.101(a)(1) through (a)(9)." It includes no limitation that the discount only applies to a carrier's lowest cost plan. Subsection (d) states that "Lifeline assistance shall be made available to qualifying low-income consumers as soon as the Administrator certifies that the carrier's Lifeline plan satisfies the criteria set out in this subpart." It is not reasonable to believe that the FCC would intend to limit Lifeline customers to a carrier's lowest cost plan and not mention it in the rule defining Lifeline.

14.    47 C.F.R. § 54.407 Reimbursement for offering Lifeline provides:

(a) universal service support for providing Lifeline shall be provided directly to the eligible telecommunications carrier, based on the number of qualifying low-income consumers it serves, under administrative procedures determined by the Administrator.
(b) The eligible telecommunications carrier may receive universal service support reimbursement for each qualifying low-income consumer served. For each consumer receiving Lifeline service, the reimbursement amount shall equal the federal support amount, including the support amount described in §54.403(c). The eligible telecommunications carrier's universal service support reimbursement shall not exceed the carrier's standard non-Lifeline rate.
(c) In order to receive universal service support reimbursement, the eligible telecommunications carrier must keep accurate records of the revenues it forgoes in providing Lifeline in conformity with §54.401. Such records shall be kept in the form directed by the Administrator and provided to the Administrator at intervals as directed by the Administrator or as provided in this Subpart.

Like § 54.401, the definition rule, the reimbursement rule contains no indication that reimbursement is limited to the carrier's lowest cost plan. Further, USAC's Form 497, see Attachment 1, which carriers submit to obtain subsidies, does not require carriers to identify the rate plan to which the subsidy will apply. Form 497 simply requires carriers to provide the number of qualified low-income subscribers and the amount of federal support they require. USAC does not seek this information because it pays Lifeline support regardless of the rate plan Lifeline customers choose. See infra, ¶ 24. Sprint's contention that it cannot obtain subsidies for providing Lifeline services beyond its lowest-cost plan is without merit.

15.     In Comments filed with the KCC regarding the ability of Lifeline customers to avoid overage charges, RCC Minnesota, Inc. and USCOC of Nebraska/Kansas stated:

> We note that the vast majority of customers, including low-income consumers, opt for post-paid wireless service on a contractual basis. Customers have the ability to choose from a wide variety of monthly rates, local calling areas, and usage allotments, in accordance with their budgets and calling patterns. Both RCC and USCOC encourage and assist consumers to find a rate plan that suits their usage so that they do not incur substantial overage charges. The many choices a consumer has with wireless rate plans are far more effective at enabling consumers to control their monthly telecommunications expenditures than a per minute blocking option would be.

Joint Comments of RCC Minnesota, Inc. and USCOC of Nebraska/Kansas LLC Regarding Feasibility of Per-Minute Blocking for Lifeline Customers, ¶ 6. KCC 446 docket. December 20, 2006. Although, RCC and USCOC do not specify that they are compensated by USAC for the discount on the many usage plans they offer their Lifeline customers, it is reasonable to assume that they are compensated, or they would not provide this benefit to their customers.

16.     Given the FCC's rejection of arguments similar to those Sprint makes here, and the USAC's practice of paying support regardless of rate plan, Sprint's claim that the KCC's ETC requirement is an "unfunded mandate," subjecting Sprint to impermissible CMRS rate regulation prohibited by 47 U.S.C. § 332(c)(3)(A), lacks credibility and should not be accorded any weight.

17.     Based on pleadings filed to date by Sprint, Sprint has not proved facts in support of its claims that would entitle it to relief. The KCC therefore asks the Court to grant its 12(b)(6) motion and dismiss Sprint's Complaint.

**IN THE ALTERNATIVE, THE COURT SHOULD STAY THIS PROCEEDING AND REFER THE INTERPRETATION OF 47 U.S.C. § 54.403(b) TO THE FCC UNDER THE DOCTRINE OF PRIMARY JURISDICTION.**

18.     If the Court finds that it cannot grant the KCC's 12(b)(6) Motion, it should stay its proceedings and refer the matter to the FCC under the doctrine of primary jurisdiction.

19.     The primary jurisdiction doctrine "requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." Reiter v. Cooper, 507 U.S. 258, 268 (1993) (footnote and citations omitted). "Primary jurisdiction is invoked in situations where the courts have jurisdiction over the claim from the very outset but it is likely that the case will require resolution of issues which, under a regulatory scheme, have been placed in the hands of an administrative body." Marshall v. El Paso Nat. Gas Co., 874 F.2d 1373, 1376 (10th Cir. 1989). The purposes of the primary jurisdiction doctrine are to "(1) ensure desirable uniformity in determination of certain administrative questions, and (2) promote resort to agency experience and expertise where the court is presented with a question outside its conventional experience." Multi Solutions Int'l, Inc. v. Southwestern Bell Tel. Co., 265 F. Supp. 2d 1216, 1225-26 (D. Kan. 2003) (Multi Solutions).

### Tenth Circuit Case Law Supports Referral to the FCC Under the Primary Jurisdiction Doctrine

20.     In deciding whether to invoke the primary jurisdiction doctrine and refer an issue to an agency, the Tenth Circuit considers two major factors: "whether the issues of fact raised in the case are not within the conventional experience of judges; or whether the issues of fact require the exercise of administrative discretion, or require uniformity and consistency in the regulation of the business entrusted to a particular agency." Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1377 (10th Cir. 1989) (citing Far East Conference v. U.S., 342 U.S. 570, 574-75 (1952)). In addition to these two major factors, the Tenth Circuit recognizes other relevant considerations:

> We have said that a district court in its discretion should invoke primary jurisdiction and defer only if the benefits of obtaining the agency's aid outweigh the need to resolve the litigation expeditiously. The district court may consider many factors in striking this balance, including: how agency action will aid the litigation; whether the litigation involves conduct requiring continuing supervision by the agency; whether the issues to be litigated are unique to regulated industries; and whether proceedings already are pending before the agency.

Mical Comms., Inc. v. Sprint Telemedia, Inc., 1 F.3d 1031, 1038 (10th Cir. 1993) (Mical). "The district court is not required to defer factual issues to an agency under the doctrine of primary jurisdiction if those factual issues are of the sort that the court routinely considers." Marshall, 874 F.2d at 1377.

21.    The resolution of Sprint's complaint is primarily controlled by the interpretation on an FCC regulation, 47 C.F.R. § 54.403(b). It states in pertinent part:

> Other eligible telecommunications carriers shall apply the Tier-One federal Lifeline support amount, plus any additional support amount, to reduce their lowest tariffed (or otherwise generally available) residential rate for the services enumerated in §54.101(a)(1) through (a)(9), and charge Lifeline consumers the resulting amount.

The Court has determined that "[t]he issue boils down to whether "lowest" refers only to "tariffed" rates or both "tariffed" and "otherwise generally available" rates." April 6, 2007 Order, p. 6. Clearly, the Court has the requisite expertise to determine any legal issue, which this essentially is. The problem arises, because, as the Court has recognized: "Both interpretations are grammatically plausible, and plaintiff cites no authority that its interpretation is the correct one." Id. A court generally decides to invoke the primary jurisdiction doctrine when a factual issue is involved. However, that doctrine is not limited to referral of a factual issue, particularly when, as here, the legal issue has broad policy implications bearing specifically on the FCC's expertise.

22.     In addition, Sprint's Complaint raises issues that, at a minimum, are a mixture of law and fact, such as Sprint's argument that the KCC's Lifeline requirement is "inconsistent" with and therefore in violation of 47 U.S.C. § 254(f).  Complaint ¶¶ 2, 33(a), 39, p. 11, ¶ 1.

23.     Sprint also alleges:

> Compliance with the Kansas Lifeline Rule would require a CMRS provider designated as a federal ETC to provide an equivalent monthly service discount to qualified, low-income consumers that will not be reimbursed by federal universal service support.  As a result, the rule would impermissibly regulate a CMRS carrier's rates in violation of 47 U.S.C. § 332(c)(3)(A).

Complaint ¶ 33(c).  47 U.S.C. § 332(c)(3)(A) provides, in relevant part:

> Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile phone services.

47 U.S.C. § 332(c)(3)(A).

24.     Whether the KCC's Lifeline requirement does, in fact, "regulate . . . the rates charged by any commercial mobile service" as Sprint argues and as 47 U.S.C. § 332(c)(3)(A) proscribes is also at least a mixed issue of law and fact requiring referral to the FCC. The resolution of this issue depends on whether the KCC is correct that Sprint will receive compensation from USAC for applying the federal Lifeline discount to all its rate plans or whether Sprint is correct that the Lifeline discount is only paid when the carrier offers the discount on its lowest cost plan.  The KCC is convinced that the discount will be paid to Sprint regardless of the plan chosen by the customer.  See supra, ¶¶ 13-16. The KCC has issued a data request to USAC to confirm that its understanding of USAC's practice is correct.  The KCC has not yet received USAC's answer.  USAC's Vice President of High Cost/Low Income, Karen Majcher, has confirmed by telephone that USAC pays Lifeline support to an ETC for any rate

plan that its Lifeline customers choose, as long as the Lifeline customer meets the qualifying criteria. She also confirmed that USAC does not require ETCs to file any information about Lifeline customers' rate plans in the application process to receive support, and USAC does not investigate this issue in any follow-up audits of ETCs regarding their use of Lifeline funds. USAC's interpretation of the regulatory scheme under which it operates does not conclusively resolve Sprint's claim that it could be subject to retroactive demand for repayment, if the FCC were to decide that Sprint's interpretation is correct,[13] but does demonstrate that support payments are made for all Lifeline plans. This is clearly a mixed legal and factual issue which only the FCC can resolve.

25.     Judges are generally not called on to determine broad communications policy issues such as what services a state commission may require an ETC to provide within the purview of 47 U.S.C. § 254(f) or where the boundary lies between exclusive federal regulation of CMRS carriers' rates and state implementation of a federal support mechanism. In addition, these issues require a uniform interpretation that will provide guidance to states in crafting regulations and to carriers in making prospective business decisions.

26.     A decision by this Court resolving Sprint's complaint in its favor would require the KCC to prohibit all other carriers from offering Lifeline customers a discount on plans other than their lowest cost plan. This would have a detrimental impact on customers that are currently taking advantage of other plans. It also would discriminate against Kansas Lifeline customers who would be limited to the lowest cost plans of carriers that now allow Lifeline customers nationwide to choose their calling plans. Customers in other states would be able to continue to benefit from a choice of plans. A uniform policy is necessary to ensure that Kansas

---

[13] March 27, 2007 Transcript, p. 48, ll. 6-13.

customers may derive the same Lifeline benefits as customers in other states. A referral to the FCC for a decision on this issue would achieve such uniformity.

27.     The KCC must assume that Sprint provided the Court with all available authority on interpretation of the regulation in its Memorandum. The KCC certainly provided all authority it could find to support its position at the hearing. Therefore it is unlikely that additional legal or factual authority can be provided to further assist the Court in determining which interpretation is correct, and the Court has determined that both are plausible. The FCC promulgated this regulation. It is the appropriate entity to decide what it means. If the Court denies the KCC's 12 (b)(6) motion, the Court should stay these proceedings and refer the dispute to the FCC for an authoritative and uniformly binding interpretation of its regulation.

**Other factors favor referral**

28.     The "other factors" that are considered by the 10th Circuit in application of the primary jurisdiction doctrine also favor referral to the FCC. See Mical, 1 F.3d at 1038. First, agency action will aid the litigation by seeking at least a preliminary analysis and resolution of a contested issue of fact - whether Lifeline support is appropriately paid for calling plans that are not the carrier's lowest cost plan - before the body best qualified to address it. Second, although the litigation here regarding the validity of the rule does not require ongoing FCC supervision, an FCC decision on whether the rule impermissibly regulates CMRS carriers will help states design and implement regulations for ETC designation and will assure ETCs, such as Sprint, that USAC is paying federal Lifeline support in the manner intended by the FCC. Third, the issues here are unique to the regulated communications industry and, in particular, to ETCs; their resolution requires "expertise and a familiarity with the industry[,]" further supporting referral to the FCC. Mical, 1 F.3d at 1040. Fourth, although the KCC is not aware of the same or similar issues being

15

addressed in other proceedings before the FCC, the absence of any such proceedings should not preclude referral where so many other factors support it.

### Referral of a primarily legal issue is appropriate

29.    Although Marshall indicates that primary jurisdiction referral is available only for "issues of fact,"[14] a developing body of case law applies primary jurisdiction more broadly. In Mical, the issue was whether billing and collections related to 900 telephone calls were services "in connection with" transmission and therefore covered by the Communications Act. The Tenth Circuit Court of Appeals stated:

> Obviously, considered broadly, this case involves the sort of statutory interpretation in which courts regularly engage. We must simply determine whether the billing and collection service at issue is a service "in connection with" transmission service under the Communications Act. But, considered more specifically, this case involves the appropriate characterization of a specific and relatively new service, in a rapidly changing industry, which has already been the subject of a number of orders and rulings by the FCC, none of which appears to address the *precise* issue here. And that precise issue is pending before the FCC now. There is therefore a real possibility that a decision by this court prior to the FCC's response to the ACI petition would result in conflicting decisions, either between our court and the FCC or our court and another circuit if the FCC ruling is appealed.

Mical, 1 F.3d at 1039-40. The Mical court did not explicitly address whether the issue presented there was a factual issue, a legal issue, or a mixed issue of law and fact, or whether that characterization was relevant to its primary jurisdiction determination.

30.    The issue in Mical involved "statutory interpretation" similar to the issues in the instant case and Mical supports referral even in the absence of purely factual issues. As in Mical, the issue here is not a clear issue of simple "statutory interpretation." It involves a complex interplay between federal and state regulatory authority in the area of ETC designation and

---

[14] See supra ¶ 19.

16

regulation of wireless carriers. This is an issue that the FCC is more qualified to decide and which should be left to the FCC to ensure uniform application in all states.

       31.     In <u>Multi Solutions</u>, 265 F. Supp. 2d at 1216, the District Court for the District of Kansas found that the plaintiff's claims involved tariff interpretation, determination of a tariff's reasonableness, and the legal effect of tariffs after withdrawal. Recognizing that both factual and legal issues were presented, the court nonetheless referred the dispute to the FCC under the doctrine of primary jurisdiction, because referral served the policies underlying the doctrine:

> The legal standards involved in this issue of reasonableness will turn largely on the interpretation of the defendants' obligations under the tariffs and the determination of those obligations following the withdrawal of those tariffs. The court believes there is a significant concern for uniformity in answering these administrative questions. Indeed, a decision on this issue would amount to policy decisions regarding the implementation of this new service and the adequacy of the tariffs.

<u>Multi Solutions</u>, 265 F. Supp. 2d at 1227.

       32.     Similarly, any "legal issues" in this case, including any issues of statutory interpretation, will require uniformity so states and carriers can know the permissible scope of regulations implementing the Lifeline program and plan accordingly. The issues presented here unavoidably call for policy determinations regarding the permissible scope of state regulatory authority to implement the Lifeline program.

       For the reasons set out above, the KCC requests the Court dismiss Sprint's Complaint for failure to state a claim on which relief can be granted. In the alternative, the KCC requests the Court refer this matter to the FCC under the doctrine of primary jurisdiction.

Respectfully submitted,

KANSAS CORPORATION COMMISSION

/S/ Eva Powers
Eva Powers, S.Ct. # 09300
  Assistant General Counsel
1500 SW Arrowhead Rd.
Topeka, Kansas  66604
Telephone:  (785) 271-3173
Facsimile:   (785) 271-3167
e.powers@kcc.state.ks.us

and

W. Bret Lawson, S.Ct. # 14729
  Assistant General Counsel
1500 SW Arrowhead Rd.
Topeka, Kansas  66604
Telephone:  (785) 271-3273
Facsimile:   (785) 271-3167
b.lawson@kcc.state.ks.us

Attorneys for Defendants Moline
Moffet and Krehbiel

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above and foregoing Memorandum in Support of Motion to Dismiss was served on each of the following parties by first-class/electronic/facsimile mail this 16th day of April, 2007:

     Mark D. Hinderks
     STINSON MORRISON HECKER LLP
     12 Corporate Woods
     10975 Benson, Suite 550
     Overland Park, Kansas  66210-2008
     mhinderks@stinson.com
     Attorney for Plaintiff Sprint Spectrum, L.P.

     Matthew A. Slaven
     BRIGGS AND MORGAN, P.A.
     2200 IDS Center
     Minneapolis, Minnesota  55402-2157
     mslaven@briggs.com
     Attorney for Plaintiff Sprint Spectrum, L.P.

                        /S/  Eva Powers
                        Eva Powers, S.Ct. # 09300
                        Assistant General Counsel